BYRNES, Judge.
This is an appeal from a declaratory judgment. We affirm.
FACTS
In 1982 The Audubon Park Commission solicited bid proposals for a restaurant to be located in the Audubon Park Zoo. After bid proposal packages were distributed to all interested parties, three bids were submitted. Of these three, one was unacceptable for reasons not relevant to this appeal. The remaining two bids were submitted by appellant, Plantation On The Green Incorporated (Plantation), and appellee SBG Audubon Corporation (SBG). When the Commission awarded the lease to SBG, Plantation sought a declaratory judgment based on the following arguments:
1.) SBG did not have corporate existence when its bid was submitted.
2.) SBG’s bid was not the highest bid submitted.
3.) The bidding process itself was void for failure to comply with the provisions of the Public Bid Lease Law (R.S. 41:1211 et seq.)
*301 The trial judge ruled in favor of SBG and Plantation has appealed.
CORPORATE EXISTENCE
Plantation’s first argument is that SBG did not have corporate existence when its bid was submitted. Plantation bases its contention on the facts surrounding SBG’s incorporation.
On November 24, 1982, the articles of incorporation for SBG Corporation were drafted in authentic form. Prior to drafting the articles, the incorporators contacted the Secretary of State’s office to ascertain if the name SBG Corporation was available and if so, to reserve it. They were told that the name was available and the articles were executed in reliance on this information. On November 30, 1982 the incorpora-tors learned that the Secretary of State’s Office had been mistaken and that the name SBG Corporation was already taken. As a result of this information an amendment to the articles of incorporation was executed, changing the name of the corporation to SBG Audubon Corporation. This amendment was delivered to the Secretary of State’s office on December 1, 1982.
Plantation argues that this change was not effective until December 1, 1982 when the amendment was filed and therefore SBG did not have corporate existence on November 24, 1982 when its bid was submitted. Plantation bases its contention on R.S. 12:35(C) which deals with corrections to articles of incorporation or initial reports and provides in pertinent part:
The certificate of correction shall be effective as of the date the original instrument is filed, except as to those persons who are substantially and adversely affected by the correction and as to those persons the corrected certificate shall be effective from the filing date.
Relying on that section Plantation urges that, because they were adversely effected by losing the lease to SBG, the name change should not be retroactive to November 24. We disagree.
La.R.S. 12:23(F) specifically provides:
F. The assumption of a name in violation of this section shall not affect or vitiate the corporate existence, but the court having jurisdiction may, upon application of the state or of any person, unincorporated association or corporation interested or affected, enjoin a corporation from doing business under a name assumed in violation of this section, although its articles may have been filed and recorded and a certificate of incorporation issued.
Thus it appears that resolution of this issue depends not on the effective date of the change in name but on when SBG Audubon’s corporate existence commenced.
R.S. 12:25 controls the date on which corporate existence begins and provides in pertinent part:
B. When all incorporation taxes, fees and charges have been paid as required by law, the Secretary of State shall record the articles or the multiple original thereof, and the initial report, in his office, endorse on each the date and, if requested, the hour of filing thereof with him, and issue a certificate of incorporation which shall show the date and, if endorsed on the articles, the hour of filing of the article with him. The certificate of incorporation shall be conclusive evidence of the fact that the corporation has been duly incorporated.
C. Upon the issuance of the certificate of incorporation, the corporation shall be duly incorporated, and the corporate existence shall begin, as of the time when the articles were filed with the Secretary of State, except that, if the articles were so filed within five days after (exclusive of legal holidays) acknowledgment thereof or execution thereof as an authentic act, the corporation shall be duly incorporated, and the corporate existence shall begin, as of the time of such acknowledgment or execution. (Emphasis added)
In this case it is undisputed that SBG’s articles of incorporation were executed as an authentic act on Thursday, November 24, 1982 and received by the Secretary of State’s office on Monday, November 29, *302 1982. It is also undisputed that the certificate of the incorporation issued by the Secretary of State gives November 24, 1982 as the day on which corporate existence commenced. The amendment changing the corporation’s name to SBG Audubon Corporation was executed and filed on December 1, 1982. November 25, 1982 was Thanksgiving Day, a legal holiday. The next two days were Saturday and Sunday. Therefore the five (5) day period provided in R.S. 12:25(C) did not begin to run until Monday, November 29, 1982. Both the original articles and the amendment changing the corporate name were filed within those five days.
Because the incorporators of SBG complied with R.S. 12:25(C) corporate existence commenced as of the date the articles of incorporation were executed. The trial judge was correct in finding that SBG Audubon Corporation had corporate existence on November 24, 1982.
THE HIGHEST BID
Plantation next argues that it submitted the highest bid and that under La.R.S. 41:1215 the Commission was required to award it the lease. That statute reads, in pertinent part:
At the date and hour mentioned in the advertisement for the consideration of bids, the bids shall be publicly opened by the lessor at its office. The lessor shall accept only the highest bid submitted to it by a person or persons who meet all the conditions of this Part... The lessor shall have the right to reject all bids.
Plantation’s bid was for 3% of gross revenues or a guaranteed minimum rent of $121,320.00. SBG’s bid was for 5.2% of gross revenue with a minimum rent of $121,000.00. It is readily apparent that the only significant difference between these two bids is the percentage of gross revenues offered. Both sides presented projected annual revenue figures with their proposals to illustrate the rentals which their respective bids would generate. While these projections are speculative to some extent they do provide a basis from which to compare the bids. However, before comparing these potential revenues, factors such as the square footage and seating capacity of each proposed restaurant must also be considered as well as certain intangibles such as the experience and background which each party would bring to the operation of their restaurant.
Plantation’s proposed structure would contain 21,700 square feet with the capacity to seat 200 a la carte diners and 300 diners at private functions. SBG’s proposal was for a 7,000 square foot structure which could seat approximately 200 a la carte diners (124 inside and 76 on a ground floor patio), and 200 special function diners. Thus, while Plantation proposed structure is larger than SBG’s the seating capacity of the two varies by only one hundred special function seats.
Although R.S. 41:1215 requires that the highest bid be accepted, a decision as to which bid was highest in this case depended in part on which proposal the Commission felt would be more successful and therefore generate more revenue for the Park. This determination rested to some degree on an evaluation of the ability of the bidders to establish and run a successful restaurant. From the foregoing it is obvious that a mere mechanical comparison of projected revenues was not the proper method to determine which proposal was higher.
In an affidavit submitted by Stephen Gamble, the sole shareholder of SBG Audubon, a formula was set forth which took into account the variance in seating capacity of the two restaurants. That formula assumed that the greater seating capacity of Plantation’s proposed restaurant would generate ⅛ more revenue than SBG’s. When these figures are applied to SBG’s projection of yearly revenues the rental generated by SBG is higher in every year but the first, when the minimum rental would apply.
Going one step further, Gamble took the projected revenues submitted by Plantation and reduced them by one fourth to compensate for the smaller seating capacity of his *303 proposed restaurant. When the percentage of profits offered by each party as rental are applied to Plantation’s figures, as adjusted by Gamble’s formula, SBG’s proposal once again generates greater revenues in all but the first year when the guaranteed minimal rental would apply.
The assumptions on which these comparisons were based seem both reasonable and conservative. Moreover, as discussed above the reliability of the projected income figures of the two proposed restaurants depended in part on the qualifications of each party as a restaurateur.
The Commission was faced with a difficult decision which required it to consider a variety of factors beyond mere dollars and cents. The affidavit of George R. Montgomery, Chairman of the Concession Committee of the Board of Directors of the Park and Zoo seems to reflect the thinking of the Commission. In that affidavit it is stated that:
While the size of the proposed Plantation on the Green facility was larger than that of the SBG proposal, the presumptive resulting additional income, which I believed and believe to be speculative, would not offset the substantial difference in percentage rental. In addition, the SBG proposal allows for expansion of its facility if needed, which I believe was and is a more realistic approach.
In addition to my belief that the SBG proposal would yield more rental to the Audubon Park Commission, I believed at that time and now believe that Mr. Gamble’s experience and qualifications were more likely to produce a high class and successful restaurant such as was and is desired by the Commission.
I expressed the opinions hereinabove set forth at the meeting of the Concessions Committee and also at the meeting of the Board which followed the meeting of the Concession Committee and the other committee and board members indicated their concurrence, which they expressed by voting to accept the SBG proposal rather than that of Plantation on the Green.
This affidavit reveals the thought process underlying the Commission’s choice and indicates that they adequately considered all relevant factors in reaching their decision. The choice which the Commission made was to accept $320.00 per year less in guaranteed rental in exchange for 2.2% greater income when rentals were pegged to profits. This seems a reasonable choice calculated to maximize the potential profit to the Park which the presence of a restaurant would create.
The clear intent of the legislature in enacting the Public Lease Law was:
“to give all persons a chance to bid on leases of public property, to prevent boards and other authorities from favoring one person over others, and to produce to the various agencies of the State ... larger revenues by requiring competitive bidding for the leases.”
Ellis v. Acadia Parish School Board, 211 La. 29, 29 So.2d 461 (1946). See also Giles v. New Orleans City Park Improvement Association, 306 So.2d 823 (La.App. 4th Cir.1975).
With this principle in mind we conclude that the Commission correctly awarded the lease to the party whose qualifications and overall proposal was most likely to generate the greatest revenue for the Park. This is what the law requires. Accordingly we affirm the trial court’s ruling that SBG’s bid was the highest submitted.
THE PUBLIC BID LAW
We now address Plantation’s contention that the entire bid process should be voided for failure to comply with R.S. 41:1211 et seq. The irregularities alleged are in the advertisement for bids, which Plantation asserts did not contain an adequate description of the land to be leased and were not published frequently enough; and in the fact that bids were delivered to the Commission by hand rather than by mail. Having reviewed the record we conclude that the Commission acted in substantial compliance with the law and that whatever irreg *304 ularities occurred were not sufficient to void the bidding process.
The advertisement in question read in part:
Audubon Park and Zoological Garden is now accepting bids for the building and management of a restaurant to be located in the Audubon Zoo, 6500 Magazine Street, New Orleans, Louisiana. Bid documents and specifications can be obtained by calling Carol Sullivan. 861-2537.
R.S. 41:1214 requires that the advertisement contain “... a description of the land to be leased.” While the exact nature of the description is not specified the clear purpose of this requirement is to inform potential bidders of the type of land being offered and where it is located. The advertisement in this case describes the land both by street address and by the phrase “to be located in the Audubon Zoo.” The street name and location of the Zoo are well known and easily ascertained by those unfamiliar with the City. We find that the advertisement published contained a description which meets the requirements of the statute.
Plantation also complains that the date on which bids were to be opened was changed from November 22, to November 24,1982 without adequate notice by way of advertisement. R.S. 41:1214 states that the advertisement shall be published for a period of not less than 15 days and at least once a week during three consecutive weeks. The original ad fixing November 22, as the date for opening bids was published daily from November 1 through November 17, 1982. Thereafter the date for opening bids was changed to November 24,1982 and this change was advertised daily from November 18 through 21 1982. All parties were aware of this change and submitted their bids on November 24. Plantation did not object to this change at the time it was made and we do not believe they should be allowed to do so at this late date. Under these circumstances we do not feel that the failure to advertise the change for the full statutory period justifies the remedy which Plantation seeks. The change was slight, it was advertised to the maximum extent possible (albeit it for a shorter period than that set forth in R.S. 41:1214), all parties were aware of the change and acted accordingly, and no objection whatsoever was made to the change.
We conclude that the Commission complied with the law to the maximum extent possible under the circumstances. It is well settled that where there is substantial compliance with the provisions of the Public Lease Law mere irregularities and informalities in the proceedings leading to the award of the lease do not necessarily void the contract. Davis v. Franklin Parish School Board, 412 So.2d 1131 (La.App. 2nd Cir.1982). West Calcasieu Port, Harbor and Terminal District v. Cajun Marine Services, Inc., 348 So.2d 169 (La.App. 3rd Cir.1977).
Plantation’s final argument relates to the method by which bids were delivered to the Commission. R.S. 41:1214 states that bids “... shall be forwarded through The United States Mail to lessor at its domiciled address.” It is undisputed that all bids, including that of Plantation, were delivered by hand and not by mail. There is no allegation that the bids were not sealed or that their contents did not remain secret. Under these circumstances we conclude that the failure of the parties to deliver their bids by mail does not justify voiding the bidding process. The Public Lease Law was substantially complied with and the purpose behind that law; maintaining the secrecy of bids, was satisfied. To void the bidding process in this case based on the irregularities alleged would be to elevate form over substance. Plantation was not only aware of the irregularities complained of but acquiesced in them without objection. The object of the Public Lease Law is to assure that the most advantageous lease possible will be obtained in an atmosphere of secret, competitive bidding. That is precisely what occurred in this case.
THE TERM OF THE LEASE
We now address an issue not raised by either party but which nonetheless has *305 troubled this court. The bid package prepared by the Commission states that the term of the proposed lease is to be 50 years. R.S. 41:1217(A), which controls the lease in question, states in part that:
“All leases executed under the provisions of this Part shall be for a period not exceeding ten years...”
This provision casts doubt on the legality of the 50 year lease offered by the Commission. However, that section also states that:
If the lease provides for the addition or construction of improvements on or to the land to a value in excess of one hundred thousand dollars and that such improvements, at the termination of the lease will become the property of the lessor without any cost to the lessor, then the lessor may grant an option to the lessee to extend the primary term of the lease for an additional ten-year period, or part thereof, for each one hundred thousand dollars worth of improvements or additions made on or to the land, for a period not to exceed a maximum term of sixty years.
The proposed lease in this case, which was attached to the bid package and is part of the record, requires that certain improvements be constructed and makes specific provisions for their, value and ownership.
Article II, Clause 16 of the lease states: The appraised value of the required improvements shall be not less than $600,-000.00. The appraisal, if needed, shall be the expense of the Tenant and shall be performed by an accredited appraiser of the Society of Real Estate Appraisers or American Institute or Real Estate Appraisers.
Clause 18 of the same Article states that: After full and final completion of the improvements and cancellation of all building contracts, and after receipt of a clear lien and privilege certificate the improvements shall become the property of, and belong to the Audubon Park Commission. This shall include all items which are defined by Articles 463-467 of the Louisiana Civil Code.
Moreover Article X of the lease entitled “Ownership of the Premisis” clearly and unequivocally states:
Upon the expiration of this lease, either by default or passage of time, all improvements constructed by the Tenant shall be the property of the Audubon Park Commission. This shall include all those items which are defined in the Louisiana Civil Code, as amended in Article 463-467.
This leaves no doubt that the Commission was justified in offering a lease with a term of 50 years. The lease requires that improvements with a minimum value of $600,000.00 be constructed at the lessee’s cost. This satisfies the statutory requirement that a lease period in excess of ten years is allowed only where improvements to the leased property exceed $100,000.00 in value. The lease also vests ownership of those improvements in the Commission upon completion of construction and upon termination of the lease. This satisfies the provision of R.S. 41:1217 which requires that improvements become the property of the lessor at the termination of the lease if the lease period is to be greater than ten years. The fact that the lease is not couched in terms of a ten year primary term with four (4) ten (10) year extensions is of no consequence. The terms of the statute have been complied with and the Commission was acting lawfully when it offered a fifty year lease under the conditions set forth above.
CONCLUSION
We affirm the judgment of the trial court and find that SBG Audubon Corporation had corporate existence when its bid was submitted; that SBG’s bid was the highest bid submitted; that there was substantial compliance with the Public Lease Law; and that the terms of the lease justify a fifty (50) year term under the provisions of R.S. 41:1217.
All costs of this appeal to be borne by appellant.
AFFIRMED.